Hunter W. Finch & Company, Appellant, v. New Ohio Washed Coal Company, Appellee.

Gen. No. 15,020.

1. CONTRACTS—*what tends to establish repudiation.* *Held,* under the evidence in this cause, that the fact of insolvency being established,

would tend to establish the issue of repudiation and that it was error to exclude evidence as to the fact of insolvency.

2. CONTRACTS—*what effects repudiation providing for delivery of coal.* A contract by the owner of a mine for the sale and delivery of coal from the mine of such owner, is repudiated by a sale of such mine.

3. CONTRACTS—*what essential to recover for breach.* A party cannot sue for a breach of contract without alleging and proving that he himself substantially complied with all the material terms of the contract.

4. CONTRACTS—*when time of essence.* Time is ordinarily of the essence of the contract in mercantile agreements; a failure, therefore, to pay for installments of merchandise delivered under a contract will justify refusal to proceed, at least until a payment has been made.

5. CONTRACTS—*when time ceases to be of essence.* If the parties by conduct disregard the provisions of the contract fixing time of payment thereunder, time ceases to be of the essence of the contract.

6. CONTRACTS—*effect of repudiation.* The repudiation of a contract calling for the delivery of merchandise gives to the other party at his option an immediate cause of action for all of the damages suffered by such repudiation, and such party has the right to call on the defendant to fill its future orders.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Reversed and remanded. Opinion filed July 15, 1910.

N. W. HACKER, for appellant.

TENNEY, COFFEEN, HARDING & SHERMAN, for appellee.

MR. JUSTICE MACK delivered the opinion of the court.

Suit was brought on the following contract:

"COAL CONTRACT: Made this 27th day of April, A. D. 1905, by and between The New Ohio Washed Coal Company, of Chicago, Illinois, with mines in Williamson County, Illinois, on the I. C. Ry., party of the first part, and Hunter W. Finch & Co., of Chicago, Ills., party of the second part.

Party of the first part agrees to sell to the party of the second part, who agrees to purchase from the party of the first part, twenty thousand (20,000) tons of their unwashed and washed coal in sizes unwashed lump and egg, and washed No. 1 and 2.

Second party agrees to take this coal in about equal monthly installments during the year commencing April 1st, 1905,

and ending March 31st, 1906, as near as market conditions will permit.

Second party agrees to pay to the first party on or before the 25th of each month for all coal shipped on its orders during the previous month.  Prices of the various sizes of coal to be f. o. b. cars at mines, mine weights to govern settlements.

| | | | |
|---|---|---|---|
| New Ohio | 6" Lump | | $1.20 |
| " | " | 6" Egg | 1.20 |
| " | " | Washed Egg | 1.65 |
| " | " | No. 2 Washed Stove | 1.30 |

In addition thereto the second party agrees to pay the first party two-thirds ($\frac{2}{3}$) of all amounts in excess of 10 cents per ton over and above the minimum mine price, as stated above, for the coal shipped under this contract.  In other words, first part is to receive two-thirds ($\frac{2}{3}$) of any premium received for the coal after second party has deducted its regular selling commission of 10 cents per ton.

EXAMPLE:  When the second party is able to obtain $1.45 per ton f. o. b. cars mines for unwashed lump coal, the party of the first part shall receive for such coal $1.30 per ton f. o. b. cars mines.

Second party agrees to place on each order sent to the first party the actual price at which the coal is sold, and to hold open to the first party at all times its books and accounts for the purpose of verifying its statements as to the division of premiums obtained for the coal.

The first party is to use due care in the mining, screening and washing of its coal and to prepare same in a good marketable condition and make shipments promptly and aid the second party in every reasonable way in disposing of the specified tonnage mentioned and satisfying the trade.

This contract is made subject to strikes, lockouts, accidents and car supply and all causes beyond the control of the parties hereto, it being understood that the party of the first part is to furnish the cars, the second party to assist in procuring same when necessary.

New Ohio Washed Coal Company,
By Fred Gardner,
Vice-Pres. & Gen. Mgr.
Hunter W. Finch & Company,
By H. W. Finch,
President."

Defendant pleaded the general issue and a set-off of about $3000. Judgment was rendered for it, on the verdict, for the amount of its set-off.

This contract, as we interpret it, is a combination of a sale and agency contract. It obligated plaintiff to take and order out 20,000 tons of coal and defendant to deliver the same on orders of resale received from plaintiff, in about equal monthly installments. A minimum price to be received by defendant was fixed in the contract; any excess reselling price was to be shared by first allowing plaintiff 10c per ton and then dividing the balance between them in the proportion of one-third to plaintiff and two-thirds to defendant. Plaintiff was to pay on the 25th of each month for all goods ordered out during the preceding month.

While defendant did not ship promptly, the record sustains its contention that this was due to car shortage and was therefore excused by the contract. It was therefore in no default on this account.

In December 1905, before December 8, after about 6,000 tons had been shipped, under the contract, and orders for 900 to 1200 tons more had been received but not filled by defendant, plaintiff was informed by defendant's officers that the mine had been sold and that no provision had been made for the purchasers thereof to take care of the contract. Defendant admitted that it did not give plaintiff's president to understand that it would protect plaintiff on the contract. Plaintiff proved the market price of these coals in December 1906 and in each of the three following months. This was greatly in excess of the minimum price fixed in the contract.

Defendant's mine was in the so-called Carterville district and produced so-called Carterville coal. The market price of coal in December 1906 and the following months testified to was of Carterville coal of the same general character, quality and market value as the New Ohio Washed Coal. There were 20 mines in the district producing great quantities of the same sort of coal.

On December 8, 1905, plaintiff wrote as follows:

"New Ohio Washed Coal Company,
    Great Northern Bldg., Chicago.

Gentlemen:

Referring to conversation a few days ago with your Mr. Harry Daniel, at which time he stated that you had now arranged to sell out your mine and that no provision had been made for furnishing us the balance of coal due us on our contract with you, which I find amounts to some 14,000 tons, I, therefore, enclose you herewith, our bill for the difference between our contract price and the present market price on this coal, which amounts to $4,666.66.

We have credited you with a balance due you on coal shipped us in October and also in November, the total of which amounts to $2,978.47, leaving a balance due us of $1,688.19, for which amount I wish you would remit promptly.

Yours very truly,
                                    H. W. Finch,
                                        Pres't.",

and sent the following statement:

"Chicago, Dec. 9, 1905.
                        Order Number........

Sold to New Ohio Washed Coal Co.,
    Great Northern Bldg.,
        Chicago.

| | | |
|---|---:|---:|
| Difference between present market price and contract price on 14,000 tons of coal due on our contract at 33⅓ per ton.............. | | $4,666.66 |
| Contra @ | | |
| By October invoices rendered......$1,527.25 | | |
| By November " " ...... 1,964.06 | | |
| | $3,491.29 | |
| Oct. 16 To memo........$ 12.82 | | |
| Nov. 13 " cash .......... 500.00 | | |
| | 512.82 | 2,978.47 |
| | | $1,688.19" |

On December 12, defendant replied as follows:

"Hunter W. Finch & Co.,
    Fisher Bldg., Chicago.
Gentlemen:

We have yours of the 8th with the statement rendered. You certainly have a very arbitrary way of doing business, in view of the contract which we made with you last April. We have complied fully with the terms of that contract on our part, but you have utterly failed to comply with your obligations. You have failed utterly to comply with the part of the contract providing that you should pay to us on or before the 25th of each month for all shipped on your orders during the previous month, and for such failures we hereby notify you that this contract is cancelled and we demand that you remit us forthwith the balance due us of $2,991.29.

We do not recognize any claim whatever on your part on the basis of the statement rendered or any other basis for the reason as before stated, that you are the parties that have committed a breach of this contract and not ourselves. We exceedingly regret that any difference should have arisen between us in this matter, but as it stands we are clearly entitled to our money, and unless we have prompt remittance we will be forced to take whatever steps may be necessary to enforce payment.

                    Very truly yours,
                        New Ohio Washed Coal Co.,
                            Harry E. Daniels,
                                Sec'y."

Defendant's sale of its mine for which a preliminary contract was made about December was consummated by delivery on December 24.

Plaintiff's president testified that he paid $500 on account of October shipments on November 13, although it was not due until November 25, on defendant's agreement to extend the payment of the balance when due. This was denied by defendant's officer with whom the conversation was had. He testified on this point as follows:

"I had a conversation with Mr. Finch on or about the 13th of November over the telephone,

Q. State whether, or not Mr. Finch requested you to extend the time of payment on the October shipment?

A. I have no recollection of such a request. I did not at that time agree to extend the time of payment. My recollection of the transaction of November 13th is that I called him up on the telephone, went over to his office, asked him for a check and finally persuaded him to give it to me.

Cross Examination.

To the best of my knowledge and belief there was no such conversation as Mr. Finch has detailed.

I have absolutely no recollection of any conversation in which I agreed to extend the time of payment of any account. As a matter of fact, it was out of my province. I was very anxious to get that money and needed it for our payroll.

Q. And you were looking after the finances of the company at that time owing to Mr. Daniels' death? A. I was doing everything I could to keep the ship afloat. I believe if I had made any such statement I would remember."

The court sustained an objection to this question asked on cross examination:

"Is it not a fact that the company was then (referring to time of the conversation just preceding the letter of December 8) insolvent and then unable to carry out that contract?"

No grounds of objection were stated. While the witness, subsequently, answering another question, claimed that defendant could have bought coal elsewhere and so carried out the contract, there is no other evidence of defendant's solvency or insolvency. If defendant was insolvent at that time, this fact would have a considerable bearing on the true interpretation of defendant's acts and would tend to confirm plaintiff's version that they amounted to a repudiation of the contract. This corporation, if insolvent, could not well have intended, and in justice to its other creditors ought not to have attempted to carry out a contract which, after the sale of the mine, would require it to make purchases in the open market and to resell at a loss. In our judgment the court erred in sustaining this objection. But, even without this

or any testimony as to defendant's insolvency, the clear pre-ponderance of the evidence demonstrates that prior to the letters of December 8 and 12, and at the conversation in re-lation to the sale of the mine, defendant had repudiated the contract. While the mine was not delivered until December 24, a preliminary contract of sale was made on December 1 and defendant's officer in general charge of the business admits that he told plaintiff's president, not that it was go-ing to be, but that it had been sold and that no provision had been made to take care of the contract. The ground of repudiation stated in the letter of December 12th—the non-payment on November 25th—was obviously an afterthought, as no reference was made thereto in the conversation and no demand was made for the money before that time.

Appellee contends, however, that even the completed sale of the mine did not render performance impossible inasmuch as the defendant could purchase the same or similar coal in the open market—that the coal to be delivered was Carter-ville coal and not coal from defendant's mines. We cannot agree with this interpretation. Defendant was not obligated to secure coal elsewhere if *e. g.* there had been a strike on its own mine. While coal of the same grade from any mine in the district might be just as good and while if defendant had entered into an absolute obligation to sell 20,000 tons of the specified coal, a court might, under some circum-stances, interpret *"New Ohio"* coal as meaning either the specific "New Ohio" or any other coal of · the same kind from the same district, nevertheless such ·cannot have been the intention of the parties to this contract. It is "their" coal which defendant is to ship and as defendant is a coal mine owner, this can mean only the coal from its mines, not any coal that it may acquire. The word "their" is the only description of the coal given in that part of the contract which imposes the obligation to sell and to buy. The only other description is in connection with the price—and there the name of defendant's own coal is used. Even if a more general term like Carterville had been there used, neverthe-

less it would have meant "their" Carterville—that is, Carterville from their mine.

But it is urged, there was nothing to prevent defendant—at any rate if it was solvent—from buying coal from its vendee. If the obligation to deliver "their" coal had been absolute, this might be a good answer; but it was not absolute, it was conditional, subject to strikes, lockouts, accidents and car supply and all causes beyond *defendant's* control. This clearly contemplated that defendant would retain control. It would be no answer to urge that by reason of the sale, defendant would not be excused because of a strike against its vendee. In our judgment this condition to defendant's obligation to perform made the contract a personal one. Plaintiff wanted defendant's coal, not a lawsuit; it was willing to take its chances of a strike against defendant or a lockout or an accident while defendant was in charge; it cannot be compelled to take a similar chance as to defendant's vendee. When defendant sold the mine, it thereby put it out of its power to assure to plaintiff the performance of its obligation in accordance with the terms of the contract, and plaintiff therefore was justified in treating the statement to it that the mine had been sold, especially, coupled with the statement that no provision had been made to carry out the contract, as a repudiation.

The court if so requested should have instructed the jury to find that defendant had repudiated its obligation. The failure, however, to give the instruction requested by plaintiff, in substance that the sale of the mine if proven constituted a breach, was not error because the court did give an instruction on behalf of plaintiff much broader and more inclusive than the one refused. We are, however, unable to see why, under the instruction given, the jury failed to allow plaintiff any damages unless it be that they believed plaintiff to be in default for nonpayment of the money due November 25th on account of the October shipments, and for that reason to have lost its right to sue.

On this question they were at defendant's request instructed as follows:

"The court instructs you as a matter of law that, if you find from the evidence and the court's instructions that the plaintiff, prior to the alleged failure or refusal of the defendant to make further deliveries under the contract had failed to pay, or was not ready and willing to pay for any of the coal delivered prior thereto and for which payment was then due according to the terms of the contract, and if you further find from the evidence that the defendant did not waive compliance with the terms of the contract as to payment, then the plaintiff in this case is not entitled to recover damages for the alleged breach of contract."

The rule of law is well established that a party cannot sue for breach of contract without alleging and proving that he has himself substantially complied with all the material terms of the contract. Harber Bros. Co. v. Moffatt Cycle Co., 151 Ill. 84. An offer, however, to offset defendant's claim for money due against plaintiff's claim for breach of the contract is, in case the latter justly exceeds the former, equivalent to a tender of money due. Such an offer was made by the statement dated December 9th. If this offer was timely, then there is no bar to plaintiff's claim for damages.

Whether or not an express extension had been granted was a question for the jury, in view of the direct conflict in the testimony; their verdict on this point is against the plaintiff. While the testimony shows no extension to any definite date, the extension, if any was granted, would be for a reasonable time; in any event, however, the question is not whether there was an enforceable contract to extend, but whether defendant by its act waived the strict performance of plaintiff's obligation; if it did, then it cannot claim that non-performance punctually on the day was such a breach as would bar plaintiff's recovery. But was an extension of any kind necessary to prevent defendant from ending the contract because of this breach? Defendant claims that by reason of the failure to pay for the October shipment on November 25th defendant was guilty of the breach of such a material obligation that it, defendant, was justified in re-

pudiating the contract on this ground, and that such a repudiation did not render it liable for damages.

Time is ordinarily of the essence of the contract in mercantile agreements; a failure, therefore, to pay for installments delivered would justify a refusal to proceed at least until a payment had been made. But as is pointed out in Williston on Sales, sec. 467, at pp. 823, 4:

"It by no means follows, however, that as soon as default is made in payment for an instalment of goods the seller is entitled to rescind the contract or totally refuse further performance, even though the default in payment continues until the time for the next delivery of goods is due. It might well be that the seller, though entitled to delay further delivery until paid for what he had already delivered, would not be entitled to continue to refuse to deliver after payment was made. The seller's right to take the latter course must depend upon the materiality of the breach. It is probable that time in regard to the payment of money on the day when it has been promised is not so vital as a failure to accept or deliver goods on the day promised."

The parties may, however in any event, by their course of dealing interpret the obligation so as to make time not of the essence and, in our judgment, that was done in this case. The conduct of the parties, the plaintiff in paying and the defendant in accepting moneys in other months, without objection, after the 25th (in July on the 27th, August 28th, and especially on October 27th for moneys due September 25th), amounts to a waiver, not of the right to demand payment promptly but of the right to repudiate, without notice or any demand, all further obligations because of a failure to pay on the 25th of the month, a waiver, in other words, of the right to require this strict performance as a strict condition precedent to the fulfillment of defendant's obligations.

Defendant, however, did not demand payment under penalty of repudiation; it treated non-payment as working *ipso facto* a forfeiture of plaintiff's right to compel further per-

formance. This it could in no event do after having impliedly waived strict performance.

But it is not only the course of dealings that barred repudiation on this ground by defendant; even if payment theretofore had been prompt on the day, nevertheless, the failure to pay on the 25th could have been subsequently waived. Any acts of the parties that amounted to a mutual recognition that the contract was still in force would bar defendant from taking advantage of this breach, except only to the extent of claiming any damages suffered thereby. Such acts of recognition are clearly shown in this case. When plaintiff demanded fulfillment of the orders given, defendant, instead of asserting its right based on the breach, was absolutely silent on this point, but it admitted its own default without reference to plaintiff's.

Moreover, on November 25th, the day for payment of the October shipments, defendant filled plaintiff's orders without requiring this payment and, subsequent to November 25th, it accepted additional orders without objection. By all of these acts, it waived any prior default by plaintiff as a condition precedent; it could no longer repudiate on this ground.

The instruction complained of, even if technically accurate, was misleading; it was not, under the circumstances, such a statement as would make clear to the jury the question at issue if the facts had been doubtful enough to submit it to them. The expression "defendant did not waive compliance" could without further explanation have readily been understood by the jury to refer to some express waiver such as the alleged extension agreement and thereby to exclude waiver by implication.

In our judgment an instruction that defendant had waived payment on the day and up to the date of its letter would have been justified; in any event the preponderance of the evidence to that effect is so clear that we cannot sustain a verdict necessarily based on a contrary finding. The instruction limiting plaintiff's damages to loss on orders placed before the repudiation was erroneous.

Finch & Co. v. New Ohio W. Coal Co., 156 Ill. App. 589.

Defendant's repudiation of its obligation gave plaintiff, at its option, an immediate cause of action for all of the damages thereby suffered by it. It had the right to call on defendant to fill its future orders. Defendant by repudiating announced that it would not fulfill even if the orders were obtained. It thereby absolved plaintiff from the necessity of securing them; that would have been time and labor lost. The market was such that it had a large assured profit if it sold the coal. As 10 cents was to have been its fixed compensation before any division of profits and was termed in the contract a selling commission, the jury would have been justified in finding, in the absence of any direct proof, that the cost of selling the coal would be at the most 10 cents, and that plaintiff had lost at least one-third of the difference between the minimum contract price plus 10 cents and the market price, not only on the coal ordered but on the whole 14,000 tons. The true measure of damages in this case, however, is not the difference between the market and contract price as the court at plaintiff's request instructed the jury, but as to orders not yet placed, one-third of the difference between the market price of similar coal at the time of repudiation and the minimum price fixed in the contract plus that part, if any, of 10 cents per ton that exceeds the cost of selling per ton, and as to orders placed, plaintiff's loss is shown by the difference between the prices to be paid by it on these orders under the contract and the prices obtained by it on the resales. The market price at the time of repudiation would be the then market price for deliveries of the 14,000 tons in about equal monthly installments during December, January, February and March. In the absence of such a market price at that time, the market prices in each of these months would control for a *pro rata* amount.

Because in our judgment the jury rendered a verdict contrary to the clear preponderance of the evidence, in refusing plaintiff any damages, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*