CHICAGO—FIRST DISTRICT—JUNE, 1913.    581

Hibernian Banking Ass'n v. Bell & Zoller Coal Co., 181 Ill. App. 581.

---

## Hibernian Banking Association, Trustee, Plaintiff in Error, v. Bell & Zoller Coal Company, Defendant in Error.

### Gen. No. 17,032.

1. APPEALS AND ERRORS—*when judgment is contrary to evidence.* In an action by a trustee in bankruptcy to recover damages for defendant's failure to deliver coal to the bankrupt according to contract, a judgment for defendant is reversed, there being evidence that after defendant's attempt to cancel the contract, the parties met and agreed to carry it out.

2. CONTRACTS—*construction.* A contract for the delivery of nine cars of coal a week is construed to mean an average of nine cars.

3. CONTRACTS—*where strict performance is waived.* Where strict performance of certain provisions of a contract has been waived for a portion of the time and performance according to a reasonable and liberal construction of the terms has been accepted by the parties, reasonable notice thereafter of an intention to return to tLe exact terms must

be given before a forfeiture or rescission can be declared by either party.

4. CONTRACTS—*forfeiture for delay in payments.* Where there have been delayed payments on a contract and such payments have been accepted for a considerable portion of the time, reasonable notice of an intention to require prompt payments must be given before a forfeiture or rescission can be declared.

5. DAMAGES—*for failure to deliver coal.* In an action to recover damage for failure to deliver coal, where plaintiff did not insist on delivery when due and it is not shown that there was any damage through failure to deliver at such time, defendant cannot be compelled to pay damages for failure to deliver at a later time when prices are higher.

6. INSTRUCTIONS—*where strike is not proximate cause of failure to perform contract.* In an action to recover damages for failure to deliver coal according to contract, the contract containing a provision making it subject to strikes, it is proper to instruct the jury that a strike in mining another kind of coal which raises the price of the coal contracted for should not be considered as a proximate cause of failure to perform.

7. PRACTICE—*where defendant is estopped to change his defense.* In an action to recover damages for failure to deliver coal, where defendant places its refusal to deliver on the ground that the contract was rescinded it is estopped "to amend its hold" by insisting on other defenses.

Error to the Municipal Court of Chicago; the HON. FREEMAN K. BLAKE, Judge, presiding. Heard in the branch Appellate Court at the March term, 1911. Reversed and remanded. Opinion filed June 30, 1913.

POPE, HOIG & FULLER, for plaintiff in error.

RYAN & CONDON, for defendant in error; IRVIN I. LIVINGSTON, of counsel.

MR. PRESIDING JUSTICE DUNCAN delivered the opinion of the court.

Hibernian Banking Association, trustee in bankruptcy of Cooke-Rutledge Coal Company, sought to recover damages in this suit from Bell & Zoller Coal Company for the latter's failure to deliver a balance of 205 cars of coal according to contract. Verdict and judgment were rendered in favor of Bell & Zoller Coal Company and the trustee in bankruptcy sued out this writ of error.

The contract sued on bears date May 21, 1902, and is an accepted proposition of defendant in error to plaintiff in error's company in these terms:

"We agree to supply and you agree to take from us nine (9) cars per week of No. 2 Nut or Pea coal from date until April 1st, 1903, on the basis of $1.40 per ton, f. o. b. Illinois Central tracks, Chicago. Mine or Illinois Central Railroad weights at Chicago to govern settlements, which are to be made on or about the 15th of the month for previous month's shipments. The above is subject to strikes or other contingencies beyond our control. Your acceptance to the above to constitute a contract between us."

The evidence for both parties shows that for the time mentioned in the contract only the following deliveries of No. 2 nut or pea coal were made by defendant in error to plaintiff in error's company at the contract price, to wit: for the week ending May 27th, 15 cars; June 3rd, 10 cars; June 10th, 6 cars; June 17th, 28 cars; June 24th, none; July 1st, 16 cars; July 8th, 22 cars; July 15th, 5 cars; July 22nd, 4 cars; July 29th, none; Aug. 5th, 2 cars; Aug. 12th, none; Aug. 19th, 6 cars; Aug. 26th, 7 cars; Sept. 2nd, none; Sept. 9th, 2 cars; Sept. 16th, 15 cars; Sept. 23rd, 8 cars; Sept. 30th, 10 cars; October 7th, 20 cars; October 14th, none; October 21st, 2 cars; from October 21st to October 23rd, 8 cars. Total delivered, 186 cars.

An inspection of the foregoing weekly deliveries of coal reveals the fact that for the time coal was delivered it was delivered irregularly. For some weeks no coal at all was delivered, for some of the weeks the deliveries were in excess of nine cars per week, while in others it was less than the contract rate of nine cars per week. Treating this contract as meaning that the deliveries should be made at an average of nine cars per week, the contract as to delivery was fully and exactly performed up to August 12, 1902, the end of the twelfth week, when exactly 108 cars had been delivered. Up to that date there were three weeks in which

584   Appellate Courts of Illinois.

Hibernian Banking Ass'n v. Bell & Zoller Coal Co., 181 Ill. App. 581.

no deliveries were made, one each in the months of June, July and August. There were five weeks in which more than nine cars per week were delivered, and four other weeks of those twelve weeks in which less than nine cars per week were delivered. From August 12, 1902, up to and including the week ending November 4, 1902, there were four weeks in which no coal at all was delivered, five other weeks in which the deliveries were less than nine cars per week and three weeks in which the deliveries exceeded nine cars per week.

With the same interpretation of the contract defendant in error owed the following deliveries of coal up to the time it ceased to deliver coal to wit: for the week ending August 19th, 3 cars; August 26th, 2 cars; September 2nd, 9 cars; September 9th, 7 cars; or a total of 21 cars. With the foregoing losses supplied the delivery of coal would be completely and exactly carried out up to October 28, 1902, the twenty-third week of the contract, with a total delivery of 207 cars of coal. For the remaining twenty-two weeks of the contract no coal at all was delivered under the contract in question, that is to say, 198 additional cars were never delivered on the contract. The first week of this delinquency ended Nov. 4, 1902, and the last week ended March 30, 1903. Under the contract the end of the first week was May 28, 1902, and the end of the last week of the contract, April 1, 1903, and all the weeks intervening those dates ended one day later than the indications above which are given as the showing under the evidence. Three witnesses for plaintiff in error testified that the market price of No. 2 nut coal, f. o. b. cars Chicago, for week ending November 5, 1902, was from $2.15 to $2.60 per ton, while two witnesses for defendant in error testified that the market price was from $1.75 to $2.25 per ton. The evidence further showed that the market price for that coal so delivered continued to increase until the week ending February 28, 1903, at which last date the market price per ton in

Chicago, as testified to by plaintiff in error's witnesses, was from $3.25 to $5.25 per ton, and by defendant in error's witnesses at from $2.10 to $2.50 per ton; that the price then began to gradually decline until March 31, 1903, at which date plaintiff in error's witnesses testified that the market price was from about $1.70 to $2.25 per ton, while defendant in error's witnesses testified that it slumped to as low as $1.40 per ton. The evidence of defendant in error's witnesses also showed that the prices of that coal through September, 1902, ranged from $1.40 to $1.55, and through the next month of October, from $1.65 to $2.00 per ton. The only evidence in the record concerning the market for that coal in Chicago for the other months of the contract was given by Mr. Bell for defendant in error, in substance, that the market in May, 1902, was dull, duller in July, 1902, and dullest in the month of August, 1902.

The weight of the evidence in this record shows clearly that the parties to said contract by their conduct interpreted it to mean that defendant in error was required to deliver, and that plaintiff in error's company was required to accept, nine cars of No. 2 nut coal on an average per week at the contract price; that the contract was recognized by both parties and treated by them as in full force until September 4, 1902, when defendant in error sought to have the contract rescinded and canceled as shown by its letter of that date to Cooke-Rutledge Coal Company, in which it said:

"We judge from the fact that what coal you have taken on your contracts with us for No. 2 nut and Carterville egg coal, that we have been obliged to call you up on the telephone and beg you to take it, that it is a hardship for you to handle this coal and as you are aware, you have not taken anywhere near the amount of coal provided for in the contracts, some weeks not taking any at all, and as we notice you are taking similar grades of coal from others, we wish to consider these contracts cancelled without a loss to either party."

That on or about September 5, 1902, Mr. Cooke, the general manager of plaintiff in error's company, visited Mr. Bell, the president of the defendant in error, and after protesting that his company had not violated any terms of the contract, secured an agreement from Mr. Bell for the defendant in error that it would resume the shipping of said coal under said contract on Monday, September 8, 1902, and would carry out the remainder of the contract until it was completed, according to the written terms thereof; that the defendant in error did resume the shipment of coal under said contract as it agreed through Mr. Bell and continued to ship coal in accordance therewith until about October 23, 1902, when it ceased to ship coal thereon entirely and refused so to do on request of plaintiff in error's company, basing its refusal on the sole grounds that the contract was canceled as per its said letter of September 4th. It is true that Mr. Cooke is the only witness that testified to the new agreement of September 5th, and that his testimony was positively denied by Mr. Bell, who was corroborated by Mr. Rundell, the clerk of the defendant in error, who testified that he was called as a witness to that new agreement, and that in the presence of Mr. Cooke, Mr. Bell stated the contract thus: "Mr. Cooke and I have been talking over this nut and pea question, and while the contract is cancelled, I want you to give them coal whenever you can, at the market price; favor them in any way you can," and that Mr. Cooke then smiled and said nothing. While it may be said that in numbers the witnesses on this proposition are two to one in favor of defendant in error, the circumstances all corroborate Mr. Cooke and are absolutely inconsistent with Mr. Bell's evidence, to wit, that during September defendant in error shipped to plaintiff in error's company thirty-five cars of that coal at the contract price, when that coal was selling at Chicago on board cars at as high as $1.55 per ton, and thirty cars more in October at the contract price

when the market price for the same delivery in Chicago was from 25 cents to 60 cents a ton higher than the contract price. It is also true that Mr. Bell testified that the coal shipped after September 5th to plaintiff in error's company was shipped to it on special orders and at the market price in Chicago. He is again corroborated in a way by Mr. Rundell that the coal was shipped on special orders and at the market price after September 5th, but all the evidence in the record without exception shows that plaintiff in error's company received and paid for coal at the contract price, while the Chicago market price for the same delivery was very much in excess of the contract price. Mr. Cooke admits making special orders for the same coal at the market price in addition to the coal received under the contract. He is fully corroborated by a letter written by defendant in error by Mr. Rundell under date of October 6, 1902, which reads thus:

"We are pleased to acknowledge your verbal order of even date given us by your Mr. Cooke for ten (10) additional cars nut and pea at $1.50 f. o. b., I. C. R. R., subject to the printed conditions on the margin of our letter head."

Now, on the same day the evidence shows without question that plaintiff in error's company received from defendant in error nine other cars (on the contract as Mr. Cooke claimed) at the contract price of $1.40 per ton. These two different prices and the words in the letter of October 6th "additional cars nut and pea" are very forceful corroborations of Mr. Cooke's evidence, and were not satisfactorily explained, so as to harmonize with Mr. Bell and Mr. Rundell's evidence. Plaintiff in error's exhibit 125, which was made up and kept in defendant in error's office for reference to the contract in question, corroborates the propositions that the parties interpreted the contract as aforesaid, and shipped coal under the contract

after September 4th.   This exhibit is headed with these words and figures:

"May 21/02.    Cooke-Rutledge Coal Company.
9 cars nut & pea coal or No. 2 nut per week.
R/C         Order         Over         Short."

Then follows under the four heads four columns of figures, those under the first head, "R/C," showing the number of cars received at the end of each week of the contract beginning with the week ending May 27th and the Exhibit stopping with the week ending September 16, 1902, the figures corresponding exactly to our figures above set forth as the receipts of coal at the contract price.   Under the head, "order," is placed a column of figure nines, indicating simply that nine cars a week was the contract provision.   Under the head, "Over," for the 1st, 2nd, 4th, 6th and 7th weeks of contract appears the following figures for those weeks respectively, 6, 1, 10, 7 and 13, which simply notes the weeks in which over shipments on the contract number were made and the number of cars for those weeks over the contract requirement of nine cars per week. Under the column "short" is found for each week the correct indication of the number of cars the shipments were short for the remaining weeks up to September 16, 1902.   Now, if there were no cars shipped under the contract after September 4th, why is there found entered on this exhibit the showing that two cars were received for the week ending September 9th and fifteen cars as received for the week ending September 16th? The whole exhibit shows clearly too that defendant in error was at all the times therein noted posted on the shipments under this contract, and that it recognized that an average of nine cars per week was the requirement of the contract, and not nine cars for every week regardless of the over shipments of other weeks, as defendant in error now contends.   Another incident corroborative of this interpretation and which shows defendant in error at that time very well contented

therewith, although the coal trade was dull and the price low, is defendant in error's letter of July 31, 1902, by Mr. Bell to plaintiff in error's company, in which these words are used:

"If you could use to-morrow and Saturday eight cars of No. 2 nut on your contract or even a part of that amount it would be greatly appreciated by us, as we are paying car service at present on that class of coal."

At that time there had been five weeks of the contract in which the deliveries were much less than nine cars per week and two of those five weeks in which none at all were delivered, the delivery for those five weeks only totaling fifteen cars altogether. Yet, there were more than an average of nine cars per week delivered up to July 31st. This letter recognized in spirit that plaintiff in error's company was not bound to accept the eight cars offered it at that time and that the contract was in force and also strongly corroborates Mr. Cooke in his testimony that no complaint was ever made by defendant in error until coal began to rapidly advance in price by reason of the strike in the anthracite coal regions of Pennsylvania and West Virginia that followed shortly thereafter. A strict and literal interpretation of the contract in question might require the delivery and acceptance of nine cars of coal every week, regardless of the fact that for some weeks more than nine cars had been tendered and accepted at the contract price. The contract, however, was susceptible of the liberal interpretation that a delivery and acceptance of an average of nine cars of coal per week was the intended requirement thereof and without doing violence to the language of the contract. As the interpretation was a reasonable one, and as the contract was prepared by the defendant in error, and the language is its language, and the interpretation aforesaid was acquiesced in by it, it ought to be bound thereby. Where strict and exact performance

590    APPELLATE COURTS OF ILLINOIS.

Hibernian Banking Ass'n v. Bell & Zoller Coal Co., 181 Ill. App. 581.

of such provisions have been waived for a portion of the time of such a contract, and performance according to a reasonable and liberal construction of the terms thereof have been accepted by the parties to a contract, reasonable notice thereafter of an intention to return to the strict and exact terms of the contract must be given before a forfeiture or rescission thereof can be declared in law by either party. The same is true in regard to delayed performance in the matter of payments on the contract, where such delayed payments have been accepted without complaint for a considerable portion of the time of the contract. *Vider v. Ferguson,* 88 Ill. App. 136; *Palmer v. Ford,* 70 Ill. 369; *Finch & Co. v. New Ohio Washed Coal Co.,* 156 Ill. App. 589; *Salt Fork Coal Co. v. Eldridge Coal Co.,* 170 Ill. App. 268. In view of those authorities the contentions herein that defendant in error under the contract was required to advance or pay the freight to the railroad company, or that plaintiff in error's company failed to pay for the coal at the times required by the contract need not be specially considered, as they were waived by the acquiescing of each party in the conduct of the other in those particulars. As there was a positive refusal of the defendant in error to carry out its part of the contract after October 23rd and upon frequent requests of plaintiff in error's company so to do, there was a positive breach on its part of the contract that was not waived, and as to the other 198 cars not delivered by defendant in error, the verdict and judgment of the court is against the manifest weight of the evidence. The judgment of the court must, therefore, be reversed. *Donelson v. East St. Louis & S. Ry. Co.,* 235 Ill. 625. As to the other twenty-one cars not delivered in August and September, no damages are shown in regard thereto for failure to deliver them at the times they were due, and we do not think defendant in error should be compelled to pay damages therefor at the October or subsequent

prices therefor, inasmuch as plaintiff in error's company did not insist on delivery when they were due.

The contract in question did not require payments for the coal shipped thereunder on any certain day. The coal shipped was usually paid for about the last of the month following the month in which it was shipped, except four cars shipped about June, 1902, which were not paid for until the following February. Plaintiff in error's company refused at first to pay for those cars, because they were "slack and buckwheat coal," and not up to the grade called for in the contract. It was clearly supported in its claim, by evidence which was unquestioned, and it could not have been considered in default had it refused altogether to pay for those four cars at the contract price. As they were paid for at the contract price, all contentions over those four cars should now be regarded as settled and out of the case.

As the cause will have to be remanded for another trial, it will not be necessary to consider the errors assigned on the instructions, except in a general way. While the contract provided that it was subject to strikes or other contingencies beyond the control of the defendant in error, it is nevertheless very clear that the anthracite strikes shown by the evidence were not the proximate cause of any delay or failure of defendant in error to comply with the contract. Evidence of that strike could only serve to explain the rapid advance of the price of coal should that explanation become proper. There was no evidence as to shortage of cars or other such contingencies that were the subjects of delay or hindrance. In such a state of the evidence the jury should be plainly informed that such a strike could not be considered by them as a proximate cause for failure to perform the contract, if any instructions thereon be given at all. *Consolidated Coal Co. v. Jones & Adams Co.*, 232 Ill. 326.

The record also clearly shows that defendant in error

by its letter of September 4th and by its subsequent letters and communications up to the beginning of this suit placed its refusal to deliver any more coal under the contract and its right to have the contract rescinded upon the sole and distinct ground that Cooke-Rutledge Coal Company had refused to accept the amount of coal provided for by the contract and for that reason was in default on the contract. The right of plaintiff in error to maintain this suit clearly depends upon the truth of that claim, and by the settled principles of the law defendant in error is not permitted "to amend its hold" by insisting on other defenses, but is estopped from so doing. *Gibson v. Brown*, 214 Ill. 330; *Ohio & M. Ry. Co. v. McCarthy*, 96 U. S. 258.

This does not mean, however, that plaintiff in error was relieved from proving in the first instance performance of the contract on the part of Cooke-Rutledge Coal Company, or a legal excuse therefor and its ability, readiness and willingness to perform the contract on its part, and also the breach of the contract by the defendant in error.

The judgment of the court is reversed and the cause remanded.

*Reversed and remanded.*