# Worth-Huskey Coal Company, Appellant, v. Columbia Malting Company, Appellee.

## Gen. No. 27,653.

1. SALES—*when breach of sales contract by seller not shown as matter of law.* No breach by the seller, of a contract to sell coal and deliver it in stated instalments, to be paid for within a specified time after delivery, is shown as a matter of law, under Uniform Sales Act, sec. 45, Cahill's Ill. St. ch. 121a, ¶ 48, relating to instalment contracts, where under the contract the seller was obligated to deliver such proportion of its output as the amount specified bore to its total obligation in the event of its inability to deliver the entire amount, for reasons beyond its control, and in such event to buy outside coal and deliver at cost, and the evidence shows that because of car shortage and a railroad embargo such contingency arose and the seller delivered the best outside coal obtainable, at cost, and that the buyer accepted and used such outside coal from time to time without objection that it was of inferior quality, until after a controversy arose over its refusal to pay therefor, and there is no substantial evidence that the seller could have delivered coal of its own mining, or that it did not furnish the best outside coal available, or of any material omission or dereliction under the contract by the seller.

2. SAVING QUESTIONS FOR REVIEW—*waiver of objection that issue not affirmatively shown.* A claim that a coal company which was obligated under contract to deliver to a milling company such proportion of its total output of coal as the amount agreed to be delivered bore to the total contract obligations of the coal company, in event of the latter's inability to deliver the entire amount contracted for, failed to affirmatively show that it shipped to the milling company its proportionate share of output of the mine, is waived by failure to raise it at the trial of the cause.

3. RESCISSION AND CANCELLATION—*when grounds for cancellation of sales contract shown.* A seller of coal under contract is shown to have been justified in canceling the contract where the contract was one for delivery of the coal in instalments which were to be paid for within a specified time after delivery and provided that the seller could deliver outside coal instead of that from its own mine in certain contingencies, which were shown to have occurred, and the evidence shows that outside coal was delivered, that the seller repeatedly requested payment therefor within the contract period, that payment was delayed and finally refused by the buyer because of alleged inferior quality of the outside coal, although

the buyer accepted and used such coal without objection, and that the cancellation was made after notice to the buyer of the seller's intention so to do unless payment should be made according to the terms of the contract, and the buyer's refusal to pay except after suit.

THOMSON, P. J., dissenting.

Appeal by plaintiff from the Municipal Court of Chicago; the Hon. SAMUEL H. TRUDE, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1922. Reversed and remanded. Opinion filed July 3, 1923.

Statement by the Court. On July 30, 1917, the Worth-Huskey Coal Company brought suit in the municipal court of Chicago against the Columbia Malting Company to recover $2,585.44 for twelve cars of coal shipped to the Columbia Malting Company in January and February, 1917. Over two years afterwards, on December 29, 1919, the Columbia Malting Company brought suit in the municipal court of Chicago against the Worth-Huskey Coal Company to recover damages in the sum of $25,000 upon an alleged breach of contract with the Worth-Huskey Coal Company for the delivery of coal from October 26, 1916, to November 1, 1918.

In each of the two suits various pleadings were filed by the respective parties and on March 8, 1920, the two cases, by order of court, were consolidated.

In the trial of the cause the Columbia Malting Company was considered as the plaintiff and the Worth-Huskey Coal Company as the defendant. Herein we shall entitle them, respectively, the Malting Company and the Coal Company.

The jury rendered a verdict of $9,061.78 in favor of the Malting Company and against the Coal Company and judgment was rendered on that verdict. This appeal is therefrom.

The trial was based upon the following pleadings: (1) An amended statement of claim, filed November 15, 1921, of the Coal Company for $2,585.44; (2) an

amended affidavit of merits, filed November 14, 1921, by the Malting Company to the amended statement of claim of the Coal Company; (3) the original statement of claim, filed December 29, 1919, of the Malting Company for $25,000 damages; and (4) an amended affidavit of defense, filed October 23, 1920, of the Coal Company to the statement of claim of the Malting Company.

The evidence shows substantially the following: The Coal Company had been selling the Malting Company its coal for a number of years prior to the time in question. The Coal Company was an Indiana corporation having its principal office in Chicago, owning and operating a coal mine in Knox County, Indiana, known as the Knox mine. The Malting Company was an Illinois corporation having its principal office in Chicago. On October 24, 1916, a written contract was entered into between the two parties. It was dated October 3, 1916, but was ratified with an addendum on October 24, 1916. It provides that the Coal Company shall furnish the entire requirements of steam coal on the part of the Malting Company, which would average approximately 600 tons per month, at $1.97 per ton "F. O. B. Del." The freight rate at the time was fixed at 87 cents per ton. The terms were as follows: "Cash on or before the 15th of each month for all coal shipped during the previous month." The contract was to expire November 1, 1918. It further provided that it was made "subject to strikes, lockouts, accidents, car supply or other causes beyond control."

It also contained the following language:

"It is hereby mutually acknowledged that the intent of this agreement is not to bind either party as to failure to perform or modified performance by reason of matters beyond the control of the party in default, but that the material shall be shipped by the seller and accepted by the buyer as per delivery specified, so far as labor, the physical conditions at the respec-

tive plants, and the ability of carrier will permit. It is mutually understood and agreed, however, that in the event of only partial fulfillment of this contract through restriction of output from causes beyond control of seller, then the buyer shall accept without recourse, such amount of coal as seller may be able to supply under a division of available coal with other obligations.  *  *  *  This agreement shall be subject to cancellation in case of violation of any of its terms or conditions.''

It was provided in an attached letter which became a part of the contract, as follows:

''With reference to our attached proposition for your coal requirements. We wish it understood that in the event of it becoming necessary for us to furnish you with any outside coal during the life of this contract, we shall be allowed to do so and bill it to you at our cost price.

''This condition will no doubt arise during the coming winter on account of the acute car shortage and the shortage of motive power on the Railroads. We will furnish you with that proportion of our production which your contract bears to our other contract obligations. After this has been done of course our legal obligation ceases, but we are writing this letter so that we may be clearly on record and contract taken with this express understanding.''

The Coal Company on October 24, 1916, began shipping coal under the contract. The first car was Knox County coal and was shipped on October 24, 1916, and paid for on January 22, 1917. The payment of freight on that car was paid by the Coal Company on November 1, 1916. Two other cars of Knox County coal were shipped by the Coal Company in October, 1916. They were paid for by the Malting Company on November 28, 1916. On October 26, 1916, one car of outside coal was shipped to the Malting Company and was not paid for until December 22, 1916. In November, 1916, eleven cars of Knox County coal were shipped, three of which were paid for on December

22, 1916, and the remaining eight were not paid for until January 22, 1917. In November, 1916, nine cars of outside coal were shipped by the Coal Company to the Malting Company, eight of them were shipped by the 11th of that month and were not paid for until December 22, 1916. One was shipped on November 23, 1916, and was paid for on January 22, 1917. In December, 1916, nine cars of Knox coal were shipped by the Coal Company to the Malting Company and were not paid for until February 6, 1917. In December, 1916, eleven cars of outside coal were shipped by the Coal Company to the Malting Company and were not paid for until February 6, 1917. The price of the outside coal between October 26, 1916, and December 28, 1916, gradually increased from $3.07 a ton to $4.97 a ton, and all the outside coal the Coal Company bought and, itself, paid for was billed and sent to the Malting Company at cost price.

The first correspondence between the parties was a letter dated November 25, 1916, in which the Coal Company sent a statement of the Malting Company's account, and therein used the following language: "As we are having to advance considerable money on coal which we have had to buy outside of our own mine, we are very much in need of funds and should appreciate it if you would kindly get check forward for this statement promptly." On January 8, 1917, the Coal Company wrote to the Malting Company as follows:

"Since Dec. 30, there has been an embargo on the Pan Handle on coal coming to Chicago. For one or two days we were able to have a few cars come through. On Jan. 3rd and since that time they have absolutely refused to let anything come forward for Chicago. The reason for this embargo is furnished us in a letter from the General Western Freight Agent of the Pennsylvania Lines which reads as follows: 'The reason for placing embargo was on ac-

count of the fact that our Chicago yards were full and one main track was blocked all of the way to Bernice, * * *. In addition, the Logansport Division was holding 1,001 cars for Chicago.' In talking with the Pan Handle this morning they state that they have hopes of clearing the situation up by the latter part of this week. We will keep you posted and advise you as soon as the embargo is raised.''

On January 22, February 6 and February 26, the Malting Company remitted checks to the Coal Company for certain cars of coal. On March 3, 1917, the Malting Company wrote the Coal Company as follows:

''We telephoned your office Friday, directing that you withhold shipments of coal to us until further orders, and now wish to advise that you ship us nothing except on our contract at contract price and from the Knox County Mine that we have been receiving from heretofore on our contract with you. Please advise promptly what shipments we may expect under these conditions, so that we may make our arrangements accordingly.''

In answer to that letter the Coal Company wrote on March 6, 1917, as follows:

''We are in receipt of yours of the 3rd, in which you confirm telephone instructions of Friday March 2nd, to hold off all shipments until further orders and your further instructions to ship you nothing but coal from our Knox mine.

''These instructions will be strictly adhered to but we cannot comply with your request to advise you what shipments you may expect, because we do not know. As a matter of fact the Pennsylvania have had a full embargo on coal for Chicago most of the winter and at other times they have restricted our division to twenty-five cars per day. Our proportion of this twenty-five cars would be about one car, whereas our Chicago business was normally twenty cars per day. Just now the embargo is lifted entirely, but we are furnished cars for on an average of about three days per week on commercial coal. Last week the amount was less than this.

"All we can do is to give you coal when we are able to do so up to the proportion you are entitled to under your contract.

"We would very much appreciate a check for your past due account and trust you will let us have it so that it will reach us not later than the 8th."

On the same date the Malting Company wrote the Coal Company stating that a certain car, Number 76,664, and which was evidently a car of outside coal, was of such poor quality that it was compelled to reject it and the Coal Company was asked to make some disposition of it.

On March 23, 1917, the Coal Company wrote the Malting Company, as follows:

"We enclose herewith statement of our account against you covering January and February shipments. According to the terms of our contract with you, both of these accounts are now past due, the contract providing for payment on the 15th of the month following shipment.

"While we regret very much that you should feel that you have not received as much coal on your contract as you should, the fact remains that we have shipped you the full proportion to which you were entitled, based upon the number of tons we were able to produce as compared with our total contract obligations. This we are able to prove by our records and inasmuch as there is a provision in the contract, which states that the letter accompanying same is considered a part of the contract and this letter provides for shipment of outside coal, we must insist upon immediate settlement of the amount due us unless you wish to consider yourself in default in carrying out your part of said contract."

That letter contained a statement dated March 23, 1917, of twenty-one items of account accruing in January and February, 1917, aggregating $3,332.84. Eight of the items were due under the contract on February 15, and thirteen of them on March 15, 1917. Three days after that letter was received, on March

26, 1917, the Malting Company wrote that it was very much surprised "to hear nothing from you as to what reduction you are willing to make, because of the very inferior coal you shipped us." That letter contained also the following:

"It was certainly your duty to provide us with good coal and that there was good coal to be had at that time is abundantly proven. As Mr. Hassmann will tell you, we complained frequently of the quality of the coal, and it was so very poor that we had to run all of our four boilers in order to get steam that we ordinarily get on two boilers. We do not see why we should stand this loss when it was no fault of ours.

"We dislike exceedingly to have this difference with you after the very pleasant relations which have existed for several years and the large amount of business that has been transacted.

"We went over this matter quite thoroughly and exceedingly courteously with Mr. Huskey a few days ago and understood when he left us that he would have something to say looking towards an amicable settlement after he had a talk with Mr. Worth."

On March 29, 1917, the Coal Company wrote the Malting Company as follows:

"Replying to your letter of March 26, would state that we gave you the best coal obtainable under the conditions which have existed the last three or four months, and have carried out our part of the contract.

"You have failed to comply with our previous demand for payment of January and February invoices, amounting to $3,332.83 and therefore we do not consider ourselves obligated to make further shipments.

"Furthermore, we shall insist that payment for our March account be made promptly on or before April 15, as specified in the contract, or we shall be obliged to institute suit."

On April 3, 1917, the following letter was written to the Coal Company by the attorney of the Malting Company:

"The Columbia Malting Company has submitted to

CHICAGO—FIRST DISTRICT—JULY, 1923.    173

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

me the contract existing between your Company and itself, for supplying coal over a period extending from October 3, 1916, to November 1, 1918, together with recent correspondence that has passed between you on the subject.

"In your letter of the 29th ult., you state that as the Columbia Malting Company has not paid the amount named in the statement presented by you, covering shipments of coal from January 5th to February 27th, inclusive, amounting to $3,332.84, you will not consider yourself longer obligated to make any further shipments under the contract.

"I herewith hand you check of the Columbia Malting Company for $431.32, payable to your order, covering shipments made on this contract now due, at contract price, which was received and unloaded, and which was satisfactory as to quality.

"The balance of $2,585.44, less $561.05, freight paid by us ($2,024.39) is for coal which you shipped at a price ranging from $4.02 to $4.57, which coal was of an exceedingly inferior quality and caused a great loss to the Columbia Malting Company. For this you are responsible and must stand the loss unless it can be adjusted.

"I am instructed by the Columbia Malting Company to say that they are willing, at this time, to pay you the balance of $2,024.39 and stand this loss, provided you will agree to ship at contract price and satisfactory quality, during the balance of the contract period the full requirements of the Company for coal during that period, which, as you know, is on an average of three to four cars a week.

"The Columbia Malting Company will not only not pay you the $2,024.39 for the very inferior coal you shipped until their damages are adjusted, but if you consider yourself no longer bound under the contract to furnish them coal in accordance therewith (for which they stand ready and willing to pay) they will go into the open market, buy their requirements of coal and sue you for the difference between the price they pay on the open market and your contract price

174    APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

on the amount of coal you would be required to ship them under their contract."

On April 9, 1917, the Coal Company wrote to the attorneys for the Malting Company as follows:

"Your letter of April 3 received, concerning the Columbia Malting Co. matter, and in which you enclose check for $431.32, together with certain invoices aggregating that amount rendered by us for coal shipped, payment for which is long past due.

"We notice the Columbia Malting Co. declines to make payment for the balance of $2,585.44 for coal shipped in January and February, unless we either make a reduction in the price or enter into a new contract with new and entirely different conditions from the one under which the shipments were made.

"You will notice that the letter attached to and made a part of the contract provides that the Columbia Malting Co. shall pay us for coal supplied from outside sources. The coal so delivered and billed by us was the best obtainable and was not rejected, but was accepted and used by them, and for which they are clearly liable. As a matter of fact, they ought to be thankful that we were able to procure coal for them at all under the adverse conditions which have prevailed in the coal business and with which they are thoroughly familiar.

"We do not quite understand from your letter whether or not the check you enclosed for $431.32 is offered on the condition that we acquiesce in the other conditions mentioned, and therefore, we are holding the same until you further inform us regarding this matter.

"If agreeable to you, we will accept the check to apply on the invoices which you enclosed without prejudice to any of our rights; otherwise, we will return the check and institute suit for the full amount, if necessary.

"You will please be advised that if the Columbia Malting Co. make any purchases on the open market and attempt to charge the difference to us, they do so at their peril, as we do not admit of the existence of any such right on their part.

"Regretting that any difficulties have arisen," etc.
On April 11, 1917, the attorney for the Malting
Company wrote to the Coal Company stating in that
letter that a check for $431.32 might be retained by
the Coal Company without prejudicing its rights, as
that was sent for coal that was sent to the Malting
Company. That letter also contained the following:

"As to the payment for the inferior coal that you
shipped, would say that we must differ with you in
your statement that it was the best coal obtainable on
the market. The Columbia Malting Company, itself,
bought coal from other sources of a first class quality
and within the price you charged for the inferior coal.
We think we will have no difficulty whatever in show-
ing that there were large quantities of good coal ob-
tainable at the time you shipped the inferior coal,
which could have been purchased by you at the price
you charged. We note what you say that the com-
pany accepted the coal and used it. Our answer to
that is, that they did not know how poor the coal was
until they used it.   *   *   *   Poor as this coal was it
was better than nothing and a shut-down.   *   *   *   If
you feel that you want to try out in the courts the
question of the quality of the coal you furnished and
the efforts you made to get good coal we are perfectly
willing to do it, and you can continue to furnish coal
under the contract without prejudice to either side
for which my clients will pay promptly."

On April 17, 1917, the Coal Company wrote to the
attorneys for the Malting Company as follows: "In
reply would again state that we contend that your
client is liable for the full amount of the $2,585.44 for
January and February shipments, the payment for
which is long past due." That letter also contained
the following:

"Furthermore, on March 23, we demanded an im-
mediate settlement of this indebtedness and on March
29, notified the Columbia Malting Company that we
would require prompt payment of our March account
on or before April 15th, as specified in contract.

176        Appellate Courts of Illinois.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

"The invoice for March shipments amounts to $566.52 and not having received a remittance, would further state that we have cancelled the contract in question.

"If you care to arrange for payment of the entire indebtedness, the same being for the balance of January and February and the March shipments before suit is instituted, kindly advise.

"We herewith enclose copy of letter sent direct to the Columbia Malting Company today."

On April 18, 1917, the Malting Company wrote to the Coal Company as follows: "We are in receipt of your letter of yesterday and enclose our check for $36.57, in payment for coal as per statement below. As you know, it has been our custom to remit for your invoices less freight, which we pay ourselves." The letter then recited that certain cars were not included as up to that time the freight bills had been delayed. On April 23, 1917, the Coal Company wrote to the Malting Company, which letter informed the Malting Company that it had made an error in the figures $36.57 and that it should have been $56.57 instead. That letter then requested a check for the difference and notified the Malting Company that the Coal Company did not by acceptance of payment waive their previous notice of cancellation of contract, and on April 24, 1917, the Malting Company sent a check for $19.67 to correct their error.

One Plewa, the superintendent of the Malting Company, testified that the Malting Company received coal from the Coal Company that was not Knox County mine run coal in November, 1916, and January, February and March, 1917; that it was very poor coal; that if you scratched it it looked like a powder; that he complained to the Coal Company ten or twelve times throughout the winter, speaking chiefly to Hassmann; that the latter came out to the plant and saw that the coal was poor but said that the Coal Company could not get different coal; that Huskey was

out and said that it was poor coal; that Hassmann said they would try and get better coal; that they had trouble with their firemen, many of them quitting; that it would sometimes take fifteen or eighteen tons of coal instead of ten; that that increased the work; that the Malting Company did not turn back a single car of coal during the winter as they needed the coal and so took it; that he saw Huskey out there and he said "it was as good coal as they could get."

One Rosenblatt, engineer of the Malting Company, testified that certain firemen quit, but the evidence shows two of them did not work later than December 30, 1916. He testified also that they began to get poor coal in December, January and February; that the bad coal looked like a pile of sand and contained occasionally big boulders or rocky stuff mixed with sulphur and slate and that when burned made a great deal of ashes and clinkers; that the average consumption was about twenty-two tons a day but with the poor coal it took about five or seven tons more a day; that Hassmann came out and "he said he could not help it sometimes. I asked him why we didn't get the coal from Knox county and he says that either the mine was out of order or over-flooded, or the pumps were out of order, or something was wrong that we could not get it"; that when Hassmann saw the coal he said he could not help it.

On cross-examination he testified that they burned considerable of the coal because they had nothing else.

The witness Graff, president of the Malting Company, testified that he talked with Hassmann in regard to the coal and Hassmann said he would look into it and go down and investigate it; that as long as they had enough coal from the Coal Company they would not go out in the market and buy coal; that as they had coal offered to them continually through that period it was his opinion that there was plenty of coal

178    APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

on the market at that time; that he bought a car of coal from the Dering Coal Company on February 20, 1917, and paid for it $3 a ton, and a car on March 2, 1917, at $3.25, which was the market price, and a car of Glendora at $2.92 per ton. Referring to the letter which was attached to the contract of October 24, 1916, Graff testified that there probably were conditions that warranted it being written and attached to the contract and made a part of it. He further testified that there was a conversation in the first half of June, 1917, concerning the settlement of the litigation out of court, and that he, Graff, offered to give $1,000 and call it square.

One Waddle, treasurer of the Malting Company, testified that after a car of coal was received by the Malting Company and unloaded he sent the bills to the office; that the Malting Company had a practice of cleaning up the coal bills on which the freight had been paid once a month; that sometimes the Coal Company would call up and ask for a check; that the Malting Company had no particular day for paying the coal bills; that sometimes they got the invoices the day after the car was shipped from the mine and would not get the freight bill until after the car had reached Chicago and been delivered, which might be three or four days up to two weeks.

On cross-examination he testified that the Malting Company could pay the freight without waiting for the freight bill but that was not the practice; that if they did not consider the freight at all they could have paid the invoices of the Coal Company; that there were a few instances where the Coal Company paid the freight on coal shipped to the Malting Company; that the railroad company sent regular freight bills to the Malting Company; that after they came the Malting Company would pay; that the Malting Company paid the freight on twelve cars of coal shipped in January and February but have not paid for the coal.

The witness, Hassmann, secretary, connected with the Coal Company for fifteen years, testified that there was a complaint in February, 1917, and he went to the Malting Company's place but the coal was already used up; that as to car 76,664, mentioned in a letter of the Coal Company of March 6, 1917, he went and looked at it; that it seemed all right and he ordered it into the plant next door, to the Albert Schwill Malting Company, and it used the car; that he called at the Malting Company's place about once in every fourteen days; that the Coal Company never refused to take a car back; that prior to March 6, 1917, the Malting Company had made a complaint, but the car was used up and he could not tell anything about it; that the Malting Company and the Albert Schwill & Co. were both equipped to use screenings.

The witness Huskey, manager of the Coal Company, testified as to the twelve cars of outside coal that were shipped and not paid for; that seven were cars of mine run from Clinton, Indiana, two cars of mine run from Little, Indiana, one, mine run from Virden, Illinois, one, a car of lump from Benld, Illinois, and one a car from Newberg, Indiana. That the Miami Coal·Company, which shipped all the coal from Clinton, Indiana, have a reputation for producing as good coal as comes from Indiana; that that company has been supplying prominent steam plants and railroads with coal for years; that if their coal was as bad as the firemen have tried to make out, ''no mine in the world could live.'' (Objection was made to this and sustained, but there was no motion to strike.) The witness further testified that he had some talk with Graff, when the latter complained about the quality of the coal, and that he, the witness told Graff, ''I was doing the best I could for him''; that as a matter of fact he did do the best he could for him.

EDWARD D. POMEROY and HENRY T. MARTIN, for appellant.

FREDERICK A. BROWN, for appellee.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

Upon the breach of an instalment contract the rights of the vendor and vendee are now to be determined by the Uniform Sales Act. By section 45 of that Act [Cahill's Ill. St. ch. 121a, ¶ 48] the following rule is announced:

"Where there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

Whether the law is now as it used to be is, therefore, unimportant. Since the passage of the aforesaid act it seems to be necessary in an equitable way to consider the substance of the alleged default, its effect, and to give a remedy according to the substance of the wrong. *Helgar Corporation v. Warner's Features, Inc.*, 222 N. Y. 449.

As the statute states, "it depends in each case on the terms of the contract and the circumstances of the case," whether the breach is sufficient to justify the injured party in refusing to proceed further and sue for damages for a breach of the entire contract, or, on the other hand, "whether the breach is severable, giving rise to a claim for compensation, but not to a right

to treat the whole contract as broken.'' So it would seem that what the court must do necessarily varies according to the particular facts in each instance. (Williston on Sales, p. 810.)

The first letter, urging the Malting Company to pay, was dated November 25, 1916, only a month after the contract was made; and that letter gave as a reason that it, the Coal Company, had ''to advance considerable money  *  *  *  to buy outside'' of their mine and was in need of funds. On January 8, 1917, the Coal Company wrote that since December 30, 1916, there had been a railroad embargo and the yards in Chicago were blocked. No other correspondence on the matter thereafter occurred until March 3, 1917, when the Malting Company wrote the Coal Company directing it to withhold shipments until further orders, and directing the Coal Company to ship nothing but from the Knox County mine. And by that letter the Malting Company then asked what shipments might be expected under those conditions.

Of course, the Malting Company could not change the written contract by merely requesting the Coal Company to ship coal only from the Coal Company mine when that contract provided that when necessary the Coal Company could purchase and ship outside coal. The letter, therefore, of March 3, 1917, might have been considered by the Coal Company, if it had so chosen, to put an end to the contract, but on March 6, 1917, the Coal Company, in answer to the letter of the Malting Company of March 3, 1917, wrote: ''These instructions will be strictly adhered to but we cannot comply with your request to advise you what shipments you may expect, because we do not know.'' That letter then informs the Malting Company that there was a railroad embargo as to coal for Chicago and that the division, in which the Coal Company is, was limited to twenty-five cars per day. In that letter the Coal Company also writes: ''We

182    APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

would very much appreciate a check for your past due account and trust you will let us have it so that it will reach us not later than the 8th.'' On March 23, 1917, the Coal Company again wrote the Malting Company, calling the attention of the latter to its past due account and also to the terms of the contract providing for payment on the 15th of the month following shipment and requesting payment for January and February. In that letter the Coal Company also writes that it has shipped the Malting Company its full proportion of coal, based upon the number of tons the Coal Company was able to produce, and closes: ''We must insist upon immediate settlement of the amount due us unless you wish to consider yourself in default in carrying out your part of said contract.'' In that letter there was a statement of account for $3,332.84, for coal which was due on February 15 and March 15, 1917.

The correspondence then shows, for the first time, in a letter dated March 26, 1917, by the Malting Company, some claim on the part of the Malting Company on account of alleged inferior coal. That letter was to the effect that the Malting Company was surprised ''to hear nothing from you as to what reduction you are willing to make, because of the very inferior coal you shipped us.'' That letter states also that the Malting Company had complained frequently as to the quality of coal and contains the words, ''We do not see why we should stand this loss when it was no fault of ours.''

Owing to the failure of the Malting Company to pay its account, matters came somewhat to a climax when on March 29, 1917, the Coal Company wrote that as the Malting Company had failed to comply with the demand for payment of the January and February invoices, amounting to $3,332.83, ''we do not consider ourselves obligated to make further shipments'' and shall insist that the March account be paid promptly

on or before April 15 "as specified in the contract" or we shall be obliged to institute suit. At that time the evidence shows that the Malting Company had not paid its account from time to time according to the terms of the written contract. It had made some payments but the Coal Company was constantly insisting that the express terms of the contract that the account should be paid on the 15th of the succeeding month should be lived up to.

After March 29, 1917, six letters passed between the Coal Company and the attorney for the Malting Company. The attorney for the Malting Company in a letter dated April 3, 1917, sent a check for $431.32, stating that that was in full for coal that had been received that was satisfactory as to quality. That letter announced that $2,024.39, which was for outside coal "of an exceedingly inferior quality," the company would not be responsible for. That letter also made a proposition to the effect that the Malting Company would pay the $2,024.39 provided the Coal Company would agree "to ship at contract price"—which would be $1.97 per ton—and satisfactory quality the balance of the contract requirements. That letter also stated that the Malting Company would "not only not pay you the $2,024.39 for the very inferior coal you shipped until their damages are adjusted" but if the Coal Company considered itself no longer bound by the contract then the Malting Company would go into the market and buy their requirements and sue the Coal Company for the difference between the market price and the contract price.

The two letters, one by the Coal Company on April 9, in answer to that of the attorney for the Malting Company of April 3, and the letter of April 11, by the attorney for the Malting Company, discuss further the account and the subject of inferior coal. The Coal Company in its letter of April 9 writes: "The coal so delivered and billed by us was the best obtainable

and was not rejected, but was accepted and used by them, and for which they are clearly liable. As a matter of fact, they ought to be thankful that we were able to procure coal for them at all under the adverse conditions which have prevailed in the coal business and with which they are thoroughly familiar.''

The letter of the attorney for the Malting Company, dated April 11, takes issue with the Coal Company on the question whether the outside coal that was shipped was the best obtainable in the market. In that letter the attorney writes: ''We think we will have no difficulty whatever in showing that there were large quantities of good coal obtainable at the time you shipped the inferior coal, which could have been purchased by you at the price you charged. We note what you say that the Company accepted the coal and used it. Our answer to that is, that they did not know how poor the coal was until they used it. * * * Poor as this coal was, it was better than nothing and a shut-down,'' etc. The letter further states that if the Coal Company wishes to try out in the courts the question of the quality of the coal and the efforts that were made to get good coal the Malting Company is willing to do that. And recites further: ''And you can continue to furnish coal under the contract without prejudice to either side for which my clients will pay promptly.'' The matter still remained in dispute and the account unpaid when on April 17 the Coal Company reiterated its contention as to the liability of the Malting Company for the January and February shipments. That letter is a cancellation of the contract by the Coal Company on account of the failure of the Malting Company to pay its account. Two other letters passed between the parties but they are negligible as pertaining merely to the rectification of a small item of account.

The twelve cars of ''outside coal'' that were

shipped during the months of January and February, 1917, were never paid for.  The contract did not prescribe the kind of "outside coal," but it was provided that the Coal Company should be allowed, in the event it became necessary, to furnish "outside coal" and bill it to the Malting Company at cost price.  Quite obviously, the Coal Company could not take any advantage of the Malting Company unless it refrained from giving that company its proper proportion of the current production of the Coal Company or failed to exercise reasonable care in providing "outside coal" of a proper quality.  There is no substantial evidence that the Coal Company did not send the Malting Company its proportionate share of the Coal Company's output.

The Coal Company could have no interest in ordering inferior "outside coal" to be shipped to the Malting Company; it had to pay for outside coal out of its own pocket in the first place, and we must assume that it was anxious to carry out its contract with the Malting Company so that it could get back at least the money it had already advanced.  It would be a very different situation if the Coal Company was charged with shipping inferior coal from its own mine.  Although it is charged by the Malting Company in its pleadings that the Coal Company did not ship the former its share of coal from the Knox County mine, that evidently was abandoned as there is no evidence of any particular value on that subject which favors the Malting Company.

Not only is there no evidence that the Coal Company did not send its share of Knox County coal to the Malting Company, but what evidence there is on that subject is to the opposite effect.  In the letter of the Coal Company of March 23, 1917, the Coal Company wrote, "the fact remains that we have shipped you the full proportion to which you were entitled, based upon the number of tons we were able to pro-

186    Appellate Courts of Illinois.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

duce as compared with our total contract obligations. This we are able to prove by our records," etc.

The evidence shows that the Malting Company did not have to shut down owing to lack of coal, so under the circumstances it is only fair to say that the Malting Company was not entitled to be rigorous as to "outside coal" which the Coal Company had to order and pay for and upon which it could make no profit. Further, there is no evidence whatever that the Coal Company did not exercise reasonable care in ordering and obtaining "outside coal" for the Malting Company.

The evidence shows that matters came gradually to a climax, the reason on the Malting Company's side being its claim that the "outside coal" which was furnished and used was not satisfactory, and the reason on the Coal Company's side being that the Malting Company refused to pay for what it had received and used, and would from its attitude refuse to pay for any future "outside coal."

It was admitted that the Coal Company was financially sound, but that is not necessarily a justification for refusing to pay, as the contract provided, on the 15th of each month. Where the seller over and over again informs the buyer that he wants his money, according to the express terms of the contract, the rigor of the law applies; and having given notice to that effect, no equity arises from former indulgence.

The chief difficulty in the case arises because on the one hand there is the express phraseology of the contract as to payment and "outside coal," and on the other qualifying circumstances which under the Uniform Sales Act must be considered and given weight. It is harder to resolve and balance the equities than to interpret the written words. It is only fair to say that as to the actual circumstances each party was quite tenacious of its supposed rights and likewise unyielding. The evidence is just as strong that the

Malting Company was trying to put off paying for "outside coal" which it had received and consumed and endeavoring to obtain assurance that it would get Knox County coal in the future, as that the Coal Company was trying to get its money for "outside coal" that had been delivered and used, without giving an assurance as to the quality of future deliveries.

The Coal Company had the right, "in the event of it becoming necessary," to furnish "outside coal" during the life of the contract. The president of the Malting Company testified that there were conditions that probably warranted putting in the conditions. The reason for that right as stated in the contract was given in these words: "This condition will no doubt arise during the coming winter on account of the acute car shortage and the shortage of motive power on the Railroads." And, as a matter of emphasis, uses these words: "We will furnish you with that proportion of our production which your contract bears to our other contract obligations. After this has been done of course our legal obligation ceases, but we are writing this letter so that we may be clearly on record and contract taken with this express understanding." The question then arises, the Coal Company having bought and paid for "outside coal" and shipped it to the Malting Company and the latter having received it and used it, and admitting in its pleadings that it had some value, did the Coal Company fail in its obligation to the Malting Company?

The latter company claims that the "outside coal" was inferior. That, however, in itself is not a sufficient defense. As to the twelve cars of "outside coal" that the Malting Company did not pay for, seven were, according to Huskey, mine run from Clinton, Indiana; two, mine run from Little, Indiana; one, mine run from Virden, Illinois; one, a car of lump from Benld, Illinois; and one, kind not stated, from Newberg, Illinois.

188    APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

Huskey says he did the best he could and the contrary is not shown. There is no substantial evidence even tending to show that the Coal Company in buying and paying for and shipping "outside coal," which it had a contract right to ship, if the situation made it necessary, failed in such a way to fulfill its contract obligation that the Malting Company was entitled to conclude that the contract had been broken. *Titley v. Enterprise Stone Co.,* 127 Ill. 457.

If the Malting Company undertook to prove that the Coal Company failed to perform, it must show some material omission, some dereliction, on the part of the Coal Company. None was shown, save that certain witnesses testified that some "outside coal" was inferior. But that does not prove or necessarily tend to prove a breach on the part of the Coal Company. As far as the record shows the Coal Company, owing to the car disturbance, found it necessary to avail itself of one of the provisions of the written contract and furnish "outside coal" and accordingly did so. *Harber Bros. Co. v. Moffat Cycle Co.,* 151 Ill. 84.

The claim that the Coal Company should have shown affirmatively that it shipped the Malting Company its proportionate share of Knox County coal and failed to do so was not made upon the trial and, even if it had been, as the pleadings and evidence now stand it would have been untenable. When the Malting Company took the "outside coal" and used it, that maintained the contract, and merely created in the Malting Company a possible right to recoupment as to the price, a right to a counterclaim measured by the difference, if any, between the market price of what it got and what it should have received. *Dalton v. Bunn & Allison,* 137 Ala. 175; *American Theatre Co. v. Siegel-Cooper & Co.,* 221 Ill. 145. In the latter case the court said the law does not permit a person to receive goods under a contract, appropriate them for his own use, and then defeat an action for the pur-

chase price on the ground that the goods were not of the exact quality or description called for by the contract. *Trippe v. McLain,* 87 Ga. 536; *Barkalow v. Pfeiffer,* 38 Ind. 214.

As the Malting Company in a letter of its attorney, dated April 3, 1917, announced positively that it would not pay the $2,024.39 which the Coal Company had charged for the cars of "outside coal" which had not been paid for, and as the Coal Company had bought that coal from outside sources and paid for it and the contract expressly provided that the coal furnished each month should be paid for by the 15th of the next month, and as the Coal Company had been insisting over and over again that the account be settled, and as the Malting Company had received and used the "outside coal," it would seem that under all the circumstances the Coal Company was justified in notifying the Malting Company that the contract was canceled. *Brown Coal Co. v. Carterville Washed Coal Co.,* 221 Ill. App. 659.

Some contention is made that the Malting Company was justified in delaying making certain payments because it had been in the habit generally of paying the freight and then deducting it from the price of the coal, and that as the freight bills did not come in with any regularity and not generally until sometime after the middle of the month, payments were made later than the contract expressly provided. We do not think, however, that that is material in the view we take of the evidence of the Malting Company as to its liability for the twelve cars of "outside coal" which it received in January and February, 1917, and for which it refused to pay.

There is some contention on the part of the Malting Company that the Coal Company bought outside coal and furnished it to the Malting Company so that it, the Coal Company, could sell its own coal at a higher price and thereby make a greater profit. In support

of that, however, there is no evidence but merely suspicion.

In our judgment, the Malting Company failed to prove that the Coal Company had broken the contract, and, further, the evidence shows that the Coal Company was justified in canceling the contract.

With the evidence as it is, making all reasonable inferences favorable to the Malting Company, there is such a failure to show a breach by the Coal Company that it becomes a question of law; and in answering that question, we hold, as said above, that no breach by the Coal Company was proven.

As the Coal Company in its original statement of claim sued for the contract price of the twelve cars of "outside coal," and in its amended statement of claim alleged its claim to be for the fair and reasonable market value of that coal, it follows, considering the pleadings and the issue precipitated, and our judgment upon the evidence as expressed above, that the judgment 'of the trial court must be reversed and a new trial had, in order merely to determine what amount, if any, is due the Coal Company for the fair and reasonable market value of the twelve cars of "outside coal." Uniform Sales Act, secs. 48, 49 [Cahill's Ill. St. ch. 121a, ¶¶ 51, 52]. *Harber Bros. Co. v. Moffat Cycle Co.*, 151 Ill. 85.

It may well be that the jury in arriving at their verdict gave the Coal Company credit for the fair and reasonable value of the twelve cars of coal and it, therefore, becomes necessary to remand the cause in order to allow the Coal Company to have its claim adjudicated. Even if there were evidence in the record as to the fair and reasonable value of the twelve cars of coal, it would still be necessary to remand the cause for a new trial as we have not the authority and power of a jury.

The judgment, therefore, will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*

O'CONNOR, J., concurs.

MR. PRESIDING JUSTICE THOMSON dissenting: While I concur in the view that the judgment of the trial court in this case should be reversed, my position is that the case should not be remanded for further proceedings. There is no difference of opinion in this court on the proposition that both the Malting Company and the Coal Company failed to submit sufficient proof to make out the causes of action set forth in their respective statements of claim.

Inasmuch as the Malting Company failed to submit sufficient proof to make out the cause of action set forth in its statement of claim, the motion made by the Coal Company for a peremptory instruction, at the close of all the evidence, should have been allowed. Therefore, so far as the judgment recovered by the Malting Company is concerned, it should be reversed. The judgment of the trial court being adverse to the claim of the Coal Company, cannot be considered to be erroneous here in view of the fact this court is of the opinion that the Coal Company failed to submit sufficient evidence to make out a prima facie case on its claim. For these reasons, I do not concur in the opinion that this case should be remanded to the trial court for further proceedings. While, on the merits of the case, I concur in the view that the judgment of the trial court cannot stand, I am not in accord with all that is said in the foregoing opinion.

The statement of claim filed by the Malting Company alleged that it had sustained damages by reason of an alleged breach of the contract by the Coal Company. In this statement of claim the Malting Company included three elements of damage which it claimed to have suffered. The first element of damage claimed by the Malting Company was based on the alleged fact that the Coal Company had complied with the contract and furnished the Malting Company with its requirements up to January 1, 1917, ''when

it refused to furnish any more Knox County, Indiana, run of mine coal of the quality required by the contract, but instead shipped outside coal,'' and it was alleged that the Malting Company had paid for this outside coal at prices in excess of those at which the Coal Company had contracted to furnish Knox County coal; and that the plaintiff had paid these excess prices relying upon the representations of the Coal Company that the Malting Company had already received its proportionate share of the Coal Company's output. But it was alleged further by the Malting Company, in its statement of claim, that this representation was untrue and, therefore, the Malting Company claimed that it was entitled to recover as damages this excess which it had paid on the outside coal, namely, the difference between the amount paid and the contract price for Knox County coal.

By the contract the Coal Company agreed to furnish the Malting Company its entire requirements of steam coal, in Knox County mine run coal. But it was stipulated that in the event of a reduction in output, due to causes beyond the control of the Coal Company, the latter was only to be required to furnish the Malting Company that proportion of the Coal Company's production which the contract of the Malting Company bore to the entire contract obligations of the Coal Company, in which event, the balance of the Malting Company's requirements were to be made up by the Coal Company shipping ''outside coal'' at such prices as the Coal Company was required to pay therefor.

There is no proof whatever in the record of the allegation contained in the statement of claim of the Malting Company to the effect that the representation of the Coal Company that the Malting Company had received its proportionate share of the Coal Company's output, at such times as the Coal Company shipped outside coal, was untrue. The Malting

Company contends that the burden was on the Coal Company to show that it had furnished the Malting Company with its proportionate part of the Coal Company's output, and that the Coal Company was thus entitled to furnish outside coal. This contention is apparently based on the theory that where a defendant is sued on his promise and the latter seeks to avoid it by proof that it was to be defeated by the occurrence of a certain contingency, it would be for the defendant to prove that it was so to be defeated, and that the contingency had happened. In this connection the Malting Company has called our attention to the case of *Perley v. Perley*, 144 Mass. 104, and other cases. In my opinion that proposition has no application to the situation presented here. It might be, if the Malting Company were suing the Coal Company on the contract and the Coal Company were seeking to avoid the contract. But here the Malting Company is not suing on the contract, but it is suing for damages for an alleged breach of the contract, and, in that connection, the Malting Company has alleged the breach and the Coal Company denies that breach. In this situation the burden is on the Malting Company to prove the breach which it has alleged. The situation is not changed because this alleged breach involves a condition, in the event of which the Coal Company was to have the right to furnish outside coal. The Malting Company has not alleged as a breach that the Coal Company failed to furnish its entire requirements in Knox County coal. It has alleged more than that, namely, that it had accepted the paid-for outside coal, on the representation that, due to causes beyond its control, the Coal Company could not meet its contract obligations in Knox County coal, and that the Malting Company had received its proportionate share of the amount which the Coal Company was able to mine, which representation was not true. Having made that allegation in its state-

194     APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

ment of claim, the Malting Company assumed the burden of proving it. Furthermore, in my opinion, the facts involved may not be said so peculiarly within the knowledge of the Coal Company as to place the burden on this issue, upon it.

The second element of damage claimed by the Malting Company in its statement of claim is based on the charge that of the total amount of outside coal furnished by the Coal Company, under its contract, "1,500 tons was of such poor quality that the fair market value was not to exceed $2,250," thus resulting in this element of damage which the Malting Company seeks to recover. There is evidence in the record from which the jury may properly have concluded that some of the coal consumed at the plant of the Malting Company during the months of November and December, 1916, and possibly later, was poor, but there is no evidence in the record, either showing or tending to show, that such coal, either in whole or in part, and if in part to what extent, was furnished under the contract in question by this Coal Company. Furthermore, there is no evidence in the record, either showing or tending to show, what the "fair market value" of this poor coal, or any part of it, was.

The third element of damages claimed by the Malting Company in its statement of claim is based on the allegation that the Coal Company had "breached the contract and informed the plaintiff (Malting Company) that it would not deliver any more coal to the plaintiff, under the contract, notwithstanding plaintiff had carried out all of the terms and conditions required of it to be carried out"; as a result of which, after due notice to the Coal Company, the Malting Company purchased its requirements in steam coal on the open market, from the time of such breach up to the conclusion of the contract period, at prices in excess of the contract price, and on this feature of the case the Malting Company claims as damages the

difference between the price in the open market and the contract price, on the quantity so purchased, as alleged in the statement of claim. In my opinion, the evidence does not show that the Coal Company "breached the contract and advised the Malting Company that it would not deliver any more coal to the Malting Company," as thus alleged by the Malting Company in its statement of claim. As above stated, there is no evidence showing that the Malting Company had not received its proportionate part of the output of the Coal Company's Knox County mine. The evidence shows that on March 3, 1917, the Malting Company wrote the Coal Company, referring to a telephone message from the former to the latter, which occurred on the previous Friday, directing the Coal Company to withhold further shipments to the Malting Company until further orders, and in this letter the Malting Company stated that they were writing to advise the Coal Company to "ship us nothing except on our contract at contract price and from the Knox County Mine * * *." That, of course, was not the obligation of the Coal Company under its contract with the Malting Company. Under that contract the Coal Company undertook to furnish the Malting Company its requirements in Knox County coal, unless causes beyond its control prevented it from mining a sufficient quantity to meet its total contract obligations, and under such circumstances the Coal Company was permitted, under the contract, to meet the requirements of the Malting Company with outside coal. Under date of March 29, 1917, the Coal Company wrote the Malting Company, calling attention to the failure of the letter to comply with the requests of the former for payment of the January and February invoices, that were due under the terms of the contract on February 15 and March 15, respectively, and in this letter the Coal Company said that by reason of this alleged failure of the Malting Company

to comply with the terms of the contract, as to payment, "we do not consider ourselves obligated to make further shipments," and in this letter the Coal Company further advised the Malting Company that, "We shall insist that payment for our March account be made promptly on or before April 15, as specified in the contract * * *." In my opinion, the evidence shows that through a long period of time, both under this contract and under a number of previous similar contracts between the parties, the Coal Company had been accepting payments which were not made by the Malting Company in strict compliance with the contract, as to time, without protest, and, therefore, it may be said that the Coal Company was not in any position to repudiate the contract, without notice, by reason of the failure of the Malting Company to make these payments as called for by the contract. *Hunter W. Finch & Co. v. New Ohio Washed Coal Co.,* 156 Ill. App. 589; *Brown Coal Co. v. Carterville Washed Coal Co.,* 221 Ill. App. 659. But, although that is the case, it may not be said that the Coal Company had waived the right to demand payment under the terms of the contract in the future. And, even where the situation is such that the seller does not have the right to repudiate or cancel the contract for failure on the part of the buyer to make payments, yet the seller may always refuse to make further shipments until past due payments are made. Williston on Sales, p. 821. In other words, where the conduct of the seller is such as to have amounted to a waiver of the requirements of the contract, as to the time of payment, the seller may not say to the buyer, "I will never perform the contract further, because you have not performed on time as you agreed to." But, nevertheless, the seller may say to the buyer, "I will not further perform until you do." When the Coal Company wrote its letter of March 29 to the Malting Com-

pany, saying that it did not consider itself obligated to make further shipments, there were invoices past due and not paid by the Malting Company, and the evidence does not show that the Malting Company had, at that time, even made any offer to set off, either the contract price or the reasonable value of the coal which the Coal Company had delivered to it, against its claim for damages. The Coal Company was therefore justified in taking the position it did on March 29, 1917.

In my opinion, there was a further justification of this position taken by the Coal Company, in the fact that under date of March 3, 1917, the Malting Company had directed the Coal Company to thereafter ship nothing to it except Knox County coal, which flat and unqualified obligation was not contained in the contract in question. Apparently the Malting Company did not thereafter recede from that position, but, by inference at least, reaffirmed it under date of April 3, 1917, when it wrote the Coal Company saying that it would pay for the coal, which it claimed was of inferior quality, provided the Coal Company would "ship at contract price and satisfactory quality, during the balance of the contract period, the full requirements of the (Malting) Company for coal * * *." Very apparently, the Malting Company was again demanding the shipment of nothing except the coal from the Knox County mine. That would seem to be the only reasonable construction to be placed on the letters of the Malting Company, dated March 3 and April 3. The Malting Company could not thus compel the Coal Company to alter the plain terms of the contract, and as the Malting Company had directed the Coal Company to make no further shipments except under those conditions, as well as for the other reason referred to, the Coal Company was justified in refusing to make further shipments.

For the foregoing reasons, I am of the opinion that

198    APPELLATE COURTS OF ILLINOIS.

Worth-Huskey Coal Co. v. Columbia Malting Co., 230 Ill. App. 165.

the Malting Company failed to make out its case on any one of the three elements entering into this claim for damages, and the motion of the Coal Company for a peremptory instruction made at the close of all the evidence should have been allowed.

As to the claim of the Coal Company against the Malting Company, as set forth by the Coal Company in its amended statement of claim: it appears that in its amended statement of claim the Coal Company sought to recover "the fair and reasonable market value" of the cars of outside coal which it shipped to the Malting Company during January and February, 1917, for which the Malting Company has never paid the Coal Company. The only evidence in the record as to value (if it may so be considered at all) consists of the invoices signed by the Coal Company, on those cars, each of which contains the price at which the coal was invoiced. But nowhere in the record is there any testimony, either showing or tending to show, what "the fair and reasonable market value" of that coal was. Nor is there any evidence to the effect that the invoiced price was the fair and reasonable market value, or even to the effect that the invoiced price was the price at which the Coal Company had purchased this coal. In its original statement of claim the Coal Company sued to recover the cost price of this coal. Why it made the change it did, in filing its amended statement of claim, does not appear. Even if the record contained evidence showing what the Coal Company paid for this coal, that would not be sufficient to prove what the fair and reasonable market value of the coal was. *Citizens' Bank of Tifton v. Adam Schillo Lumber Co.*, 188 Ill. App. 535. Certainly the price at which the Coal Company invoiced the coal to the Malting Company could, with still less reason, be considered as any showing on the question of what the fair, reasonable market value of the coal was. It is, therefore, my opinion that the Coal Company also

failed to submit sufficient proof to make out a case, under its amended statement of claim.

For the foregoing reasons, I am of the opinion that the judgment of the municipal court should be reversed.